| | |
|---|---|
| QUINCY LONDALE SCOTT,    ) | |
| ) | Case No. 1:13-cv-14 |
| *Petitioner*,    ) | |
| ) | Judge Travis R. McDonough |
| v.    ) | |
| ) | Magistrate Judge Christopher H. Steger |
| DOUG COOK, Warden, [1]    ) | |
| ) | |
| *Respondent*.    ) | |

# MEMORANDUM OPINION

This matter is before the Court on a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, brought by Quincy Londale Scott ("Petitioner"), a Tennessee inmate acting pro se. Petitioner is challenging the legality of his confinement under a 2006 Hamilton County, Tennessee judgment [Doc. 1]. A jury convicted Petitioner of facilitation of first degree murder, attempted especially aggravated robbery, carjacking, and two counts of aggravated robbery [*Id.*]. For these offenses, Petitioner received an effective sentence of thirty-seven years [*Id.*]. Respondent has filed an answer to the petition, which is supported by copies of the record [Doc. 10; Addenda Nos. 1–4]. Petitioner has failed to reply to Respondent's answer, and the time for doing so has passed.

## I.    PROCEDURAL HISTORY

Petitioner's conviction was affirmed on direct appeal by the Tennessee Court of Criminal Appeals ("TCCA") [Addendum No. 2, Doc. 3, p. 835]. The Tennessee Supreme Court denied

---

[1] Doug Cook replaced Stanton Heidle as the Warden of the Bledsoe County Correctional Complex. Accordingly, the Clerk is **ORDERED** to change the name of the respondent on the Court's CM/ECF docket s

Petitioner's application for permission to appeal [*Id*. at Doc. 5, p. 876].  Petitioner next filed a motion for post-conviction relief in the Hamilton County Criminal Court [Addendum No. 3, Doc. 1, pp. 881–912].  The denial of Petitioner's post-conviction petition was affirmed on appeal to the TCCA [Addendum No. 4, Doc. 3, p. 1091].  Petitioner's application to the Tennessee Supreme Court for permission to appeal was denied [*Id*. at Doc. 4, p. 1098].  Thereafter, Petitioner filed this timely application for habeas relief.

## II.     BACKGROUND

The trial court initially held a hearing to address Petitioner's motion to suppress statements that had been made to the police department [Addendum No. 1, Vol. 7, p. 521]. Petitioner's motion argued that because of his intoxicated condition at the time his statements were taken, they were involuntary [Addendum No. 1, Vol. 1, p. 24].  At the motion to suppress hearing, Officers Phillips and Irvin testified on behalf of the state, and Petitioner testified on his own behalf [Addendum No. 1, Vol. 7, pp. 525, 558, 563].  Officer Phillips testified that the first time they interviewed Petitioner was on August 7, 2002, and that he was not under arrest at the time [*Id*. at 527].  According to Officer Phillips, he filled out the top of the *Miranda* waiver form, read the rights portion to Petitioner, as was the usual practice, then gave Petitioner the form to read over and to sign [*Id*. at 529].  Officer Phillips testified that Petitioner signed his waiver, agreed to talk to the officers, and did not appear to be under the influence of any drugs or alcohol [*Id*. at 530–31].  Officer Phillips further testified that he interviewed Petitioner a second time on August 14, 2002 [*Id*. at 533].  Officer Phillips stated that, unlike the first interview, this time Petitioner was in custody because he had been arrested on a probation violation [*Id*. at 534]. Officer Phillips testified that Petitioner did not appear to be under the influence of any drugs or narcotics, and that he again followed the usual procedure with respect to obtaining a rights

2

waiver from Petitioner [*Id*. at 534–35]. It was during this second interview that Petitioner confessed to his role in the crimes of which he was ultimately convicted [*Id*. at 538–39].

Officer Irvin next testified that he was only present at Petitioner's second interview on August 14, 2002 [*Id*. at 559–60]. According to Officer Irvin, he would have signed the waiver form as a witness only after Petitioner signed it, to show that he acknowledged that it was Petitioner that signed and dated the form [*Id*. at 561]. Petitioner testified that he signed both of the *Miranda* waivers on the same day [*Id*. at 565]. According to Petitioner, he had been told that the first waiver had been misplaced, and was asked to sign a second one after he gave a taped statement on August 7, 2002 [*Id*. at 566]. Petitioner testified that on the date of his second interview, he was "halfway there" because of some pills he had taken from his cellmate [*Id*. at 567]. Petitioner further testified that he asked for a lawyer before his August 14 interview but was told that he could not have one [*Id*. at 580]. Petitioner also testified that he did not tell any of the officers at his second interview that he had taken medication [*Id*. at 578].

At the conclusion of the hearing, the trial court found that after reviewing the waivers and transcripts of Petitioner's statements, it appeared that Petitioner knowingly and intelligently waived his rights [*Id*. at 620]. The court stated that, even if Petitioner was sleepy or under any form of medication, it did not appear that it affected him enough to make his statement involuntary [*Id*.].

The remainder of the factual background is taken from the TCCA's summary of the evidence presented at Petitioner's trial.

> On June 18, 2003, the Hamilton County Grand Jury returned
> indictment number 244725, charging [Petitioner] in count one with
> the carjacking of Courrie Long's vehicle and in count two with the
> aggravated robbery of Courrie Long. The grand jury also returned
> indictment number 244718, charging [Petitioner] in count one with
> the first degree felony murder of Brian Scott Hall, in count two

3

with the especially aggravated robbery of Brian Scott Hall, and in count three with the aggravated robbery of Morris Talley.

. . .

[Petitioner's] convictions were based upon the following proof of three events which all occurred within a few hours in the late night hours of July 30, 2002, and the early morning hours of July 31, 2002. [Petitioner] gave a taped statement to police, summarizing the evening's activities. The statement, which was played for the jury, revealed that late in the evening on July 30, 2002, [Petitioner] borrowed a small four-door vehicle from "Toya," otherwise known as Katara Holloway, who lived in the Woodlawn Apartment complex. Holloway testified that at 9:00 or 10:00 p.m. on July 30, 2002, she loaned her red 1992 Nissan Stanza to [Petitioner]. Holloway said that at 9:00 a.m. the next morning, Mario Fulgham returned the car to her.

[Petitioner's] statement revealed that after he got the vehicle from Holloway, he picked up his co-defendants, James "Baby James" Westbrook and Mario Fulgham. Latara K. Smith, [Petitioner's] cousin, verified that at approximately 9:20 p.m. on the night of July 30, 2002, [Petitioner] and Fulgham came to her sister's residence, which was about a block away from Woodlawn Apartments, to pick up Westbrook. Latara Smith said that [Petitioner] and Fulgham were in Holloway's red car. Smith testified that Fulgham retrieved guns from her sister's residence, and the three men left the residence together at approximately 10:30 or 11:00 p.m. According to [Petitioner's] statement to the police, Fulgham was driving the car. [Petitioner] said that all of the perpetrators were wearing black clothes, toboggans, black bandanas, and black hoods. [Petitioner] said that he was carrying a twenty gauge shotgun and that Westbrook was carrying an SKS assault rifle.

[Petitioner] told police that while they were driving around, they robbed a man near the East Lake area. Morris Talley testified that he was robbed while walking on 25[th] Street near 4[th] Avenue in the East Lake area in the late night hours of July 30, 2002, or the early morning hours of July 31, 2002. [Petitioner] told police that upon seeing Talley, his co-defendants said "Let's get him." [Petitioner] and Westbrook jumped out of the vehicle, but Fulgham stayed in the vehicle. Talley saw the two men, wearing ski masks, and carrying guns, jump out of the car. [Petitioner] and Westbrook pushed Talley into the bushes. Talley recalled that one of the guns was an "AK, SK, something" assault rifle and that the other gun was also a "big gun." [Petitioner] and Westbrook demanded Talley's money. [Petitioner] said that Westbrook fired a round.

4

Talley gave the men his money, which he said amounted to $120 and some change. After the robbery, Talley ran across the street, and the perpetrators went the opposite way. Talley said that after he ran from the scene, he eventually "caught up with some other guys who had gotten carjacked or whatever." [Petitioner] told police that Westbrook did not get anything from Talley. Police later collected a shell casing from the scene.

Latara Smith testified that [Petitioner], Westbrook, and Fulgham returned to her sister's residence some time before midnight on July 30, 2002. Latara Smith saw [Petitioner] and Westbrook wipe down Holloway's red car. That was the last time Latara Smith saw the red car. The men left again after midnight.

The proof at trial revealed that at approximately 2:00 a.m., Brian Hall was making a call to Bernice Hudson from a pay telephone at a Citgo near 23[rd] Street. [Petitioner's] statement revealed that at about the same time, Fulgham was driving [Petitioner] and Westbrook in Holloway's red car in the area of 23[rd] Street. When the perpetrators saw Hall, Westbrook thought Hall might have money. Westbrook said, "Let's get him," and he jumped out of the car with the SKS assault rifle to rob Hall. [Petitioner] said that he also jumped out of the car, still in possession of the shotgun, but Fulgham remained in the car. At trial, Hudson testified that during the call, the other end of the line went quiet. She testified that she heard someone who was not Hall say "give it up cuz, then they said turn your bitch ass over." Hudson heard nothing further except perhaps the telephone swinging on its cord. [Petitioner] told police that Hall pushed [Petitioner's] shotgun and that Westbrook shot Hall. [Petitioner] thought Hall had been shot in the leg because he tried to run, then he fell. [Petitioner] said he saw a small amount of blood on Hall's back. [Petitioner] told police that he thought Westbrook might have gone through Hall's pockets but that he did not find anything.

[Petitioner's] statement reflected that after the shooting, he and Westbrook went back to the car. Police later collected a shell casing from the scene which matched the casing collected at the scene of Talley's robbery. The medical examiner testified that Hall died as a result of a gunshot wound to the back and that the injury was caused by a high velocity projectile fired from a weapon such as a hunting rifle or a military-style assault rifle; however, the medical examiner explained that the injury could not have been caused by a shot gun.

[Petitioner] said that after the murder, Fulgham drove [Petitioner] and Westbrook back to Woodlawn Apartments where the perpetrators saw "Coco [Courrie Long] and them." The

5

perpetrators knew Long and also knew about the rims on his car. Fulgham parked the car [Petitioner] had borrowed, and [Petitioner] and Westbrook approached Long. Fulgham did not follow. [Petitioner's] statement reflected that he approached Long because he and Westbrook had not obtained any money from the first two victims.

Courrie Long and Dennis Bonds testified that at approximately 2:00 a.m. on July 31, 2002, they were in one of the Woodlawn Apartments' parking lots when they saw [Petitioner] and Westbrook, who were wearing hoodies and carrying big guns, come around the corner. Long testified that one of the men had an AK or SKS assault rifle and the other had a "gauge." Long testified that the perpetrators pointed their weapons at him and Bonds and demanded money from them. [Petitioner's] statement revealed that Westbrook fired a shot then went through Long's pockets. Long also said that Westbrook fired a round and then took his money. [Petitioner] said that he did not search the victims' pockets. Long and Bonds testified that the perpetrators retrieved less than one hundred dollars from each of them, then the perpetrators turned to leave. Long testified that they stopped and said, "You think we should have killed him, cuz?" Long said the men returned and took the keys to his car. [Petitioner's] statement reflects that he and Westbrook took Long's car and left. Police later collected an SKS long rifle round from the scene.

An agent from the Tennessee Bureau of Investigation (TBI) laboratory testified that the shell casings collected from the three crime scenes were each 7.62 x 39 millimeter cartridge casings most commonly used in AK or SKS assault rifles. All three casings had been fired from the same weapon, an assault rifle.

Latara Smith testified that [Petitioner], Westbrook, and Fulgham returned to her sister's residence at about 5:00 a.m. on the morning of July 31, 2002. She recalled that Fulgham was the first to come in, and he made a "big scene" as he went through the residence. However, she said that [Petitioner] was quiet. Latara Smith testified that when the morning news came on television, footage of crime scene tape around a telephone booth at the murder scene was played. She stated that when the newscaster announced that a man was shot at the scene, Fulgham laughed, but [Petitioner] had no reaction to the news.

Latara Smith testified that when it began to rain that morning, the men tried to put the guns in a nearby ditch that had filled with water. She said that when the guns washed out of the ditch, [Petitioner] and Westbrook handed the two guns to Fulgham.

6

> [Petitioner] told police that he and Westbrook "went up to Summit" to take the rims off of Long's car. [Petitioner] maintained that they took the car to "some kind of geek" who called Markee Crutcher to deal with the car. Robert Lee Smith testified that he was a distant relative of [Petitioner]. On July 31, 2002, Markee Crutcher called Robert Smith and said that he and [Petitioner] had "bought a car up in Summit[]" and wanted him to take a look at the vehicle. Robert Smith said that Crutcher wanted him to take the wheels and engine from the car and put the parts onto another car. Robert Smith identified the car from a photograph of Long's vehicle. When Robert Smith saw [Petitioner] and another man on School Street, a couple of rifles were in the backseat of the car. Later, when Robert Smith and a girl picked up the car, the guns were no longer in the backseat. Robert Smith and the girl took the car back to Smith's house at 4609-A Green Shanty Road. Police later found Long's car at Robert's Smith's residence.
>
> [Petitioner] told police that when they left the car with Crutcher, Westbrook took the guns. Then, [Petitioner] and Westbrook went back to the house where Fulgham was staying. [Petitioner] said that he later retrieved the guns and left them in the bushes near "the projects."
>
> The jury found [Petitioner] guilty of the facilitation of the first degree murder of Hall, the attempted especially aggravated robbery of Hall, the carjacking of Long, the aggravated robbery of Long, and the aggravated robbery of Talley.

[Addendum No. 2, Doc. 3, pp. 853–857 (internal footnotes omitted)].

### III. STANDARD OF REVIEW.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires a federal court considering a habeas claim to defer to any decision by a state court concerning the claim, unless the state court's judgment: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C § 2254(d)(1)–(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or resolves a case differently on a set of facts that are materially indistinguishable from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in the Supreme Court cases that govern the issue, but unreasonably applies the principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively unreasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411.

The § 2254(d) standard is a high standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be.'") (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). Furthermore, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

Petitioner's § 2254 habeas corpus petition raises three main grounds for relief: (1) violation of Fifth Amendment rights as a result of the forgery and trickery employed by the police in obtaining his *Miranda* rights waiver; (2) ineffective assistance of counsel for failure to investigate rights waiver forms; and (3) ineffective assistance of appellate counsel during direct appeal [Doc. 1].

In his answer, Respondent argues that Petitioner is not entitled to relief on grounds one and three of his petition because they have been procedurally defaulted, as Petitioner did not

8

Case 1:13-cv-00014-TRM-CHS   Document 17   Filed 03/15/16   Page 8 of 16   PageID #: 84

raise them before the TCCA [Doc. 9]. Respondent also argues that Petitioner is not entitled to relief on ground two because the state court's determination was not contrary to nor an unreasonable application of clearly established federal law, as determined by the United States Supreme Court [*Id.*].

The Court agrees with Respondent concerning Petitioner's entitlement to habeas relief, and will **DENY** and **DISMISS** this petition for the reasons provided below.

### A. Procedural Default

#### 1. Applicable Law

Under 28 U.S.C. § 2254(b), a federal court's jurisdiction to hear a habeas claim is limited to those cases in which Petitioner has exhausted all available state-court remedies. The statute provides that

> (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that—
> (A) the applicant has exhausted the remedies available in the courts of the State; or
> (B) (i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254(b); *see also Granberry v. Greer*, 481 U.S. 129, 133–34 (1987); *Rose v. Lundy*, 455 U.S. 509, 519 (1982).

A petitioner must present each factual claim to the state court as a matter of federal law. *See Gray v. Netherland*, 518 U.S. 152, 163 (1996). In essence, a claim sought to be vindicated in a federal habeas proceeding must have been raised in the state courts so that the state courts have the first opportunity to hear the claim. "Where a petitioner has not fully and fairly presented a

9

Case 1:13-cv-00014-TRM-CHS   Document 17   Filed 03/15/16   Page 9 of 16   PageID #: 85

federal claim to the state's highest court . . ., a federal court will not consider the merits of the claim unless petitioner can show cause to excuse his failure to present the claims appropriately in state court, and actual prejudice as a result." *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

      **2.**     **Discussion**

Respondent argues that Petitioner is attempting to present his Fifth Amendment claim under a different theory than he did to the state court and, as such, the claim has been procedurally defaulted [Doc. 9]. Respondent also argues that Petitioner failed to raise his claim of ineffective assistance of appellate counsel before the post-conviction appellate court [*Id.*].

        **a.**     **Violation of Fifth Amendment right against involuntary and unintelligent statements.**

Petitioner argues that the *Miranda* rights waiver form—which formed the basis of the state court's finding that his second statement on August 14, 2002, was given voluntarily—was forged and altered by the police. Petitioner claims that the police did not read him his *Miranda* rights before the interview, and that he never signed the waiver form [Doc. 1]. Petitioner alleges that his Fifth Amendment right against self-incrimination was violated because he was "tricked" into signing a second waiver which was then altered to appear as though Petitioner signed it before the August 14 interview [*Id.*].

As Respondent correctly points out, this claim was not fully and fairly presented to the state court and, therefore, it is procedurally defaulted. During Petitioner's direct appeal, he argued to the TCCA that "he was so intoxicated that his statements were unknowing and

10

involuntary" [Addendum No. 2, Doc. 1, p. 819]. Petitioner also mentioned in his brief that he asked for a lawyer before the statement was made, but made no mention of the fact that the rights waiver dated August 14, 2002, was forged [*Id.*]. In addressing this claim, the TCCA recounted the facts of the motion suppression hearing and found that record did not preponderate against the trial court's finding that Petitioner made the statements knowingly and voluntarily [Addendum No. 2, Doc. 3, p. 859]. Likewise, Petitioner did not present this claim as a Fifth Amendment claim in his post-conviction petition; rather, Petitioner raised it as an ineffective assistance of counsel claim [Addendum No. 3, Doc. 1, pp. 897–99].

As previously mentioned, a federal court cannot grant a state prisoner's petition for habeas relief unless each and every claim set forth in the habeas petition has been fairly presented to the state courts. *Satterlee v. Wolfenbarger*, 453 F.3d 362, 365 (6th Cir. 2006) (citing *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The petitioner must present "the same claim under the same theory" presented to the state courts. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009). Particularly, a claim is not considered fully and fairly raised when it is presented under a different constitutional provision. *See, e.g.*, *Jalowiec v. Bradshaw*, 657 F.3d 293, 304 (6h Cir. 2011) (finding that presenting a claim as an ineffective assistance of counsel claim does not present it as a *Brady* claim and, therefore, does not exhaust state remedies). Based on the Court's review of the record, it does not appear that this claim was fairly presented to the TCCA either on direct appeal or during Petitioner's post-conviction proceedings. While Petitioner claimed that his intoxication made his statement involuntary and unknowing in violation of his Fifth Amendment rights, he did not assert to the TCCA on direct appeal that his rights waiver form was obtained through forgery. Even further, Petitioner has failed to allege any cause to

11

excuse his failure to raise this claim before the TCCA. As such, the claim is procedurally defaulted.

### b. Ineffective assistance of appellate counsel on direct appeal

Petitioner also argues that he received ineffective assistance of counsel during his direct appeal [Doc. 1]. In support of this claim, Petitioner merely states that his appellate attorney failed to "raise all issues on direct appeal" [*Id*. at 10]. Respondent alleges that this claim has been procedurally defaulted because it was not raised to the post-conviction appellate court [Doc. 9].[2] The record indicates that in his petition for post-conviction relief, Petitioner generally alleged that his appellate counsel was ineffective for failing to raise all the claims that were raised in petitioner's motion for new trial on direct appeal [Addendum No. 3, Doc. 1, p. 903]. On post-conviction, however, Petitioner's sole issue before the TCCA was that Petitioner received ineffective assistance of counsel at the trial court level because trial counsel failed to properly investigate the circumstances surrounding Petitioner's Miranda waiver [Addendum No. 4, Doc. 1, p. 1055]. Accordingly, because Petitioner failed to present this claim to the TCCA on post-conviction appeal, the claim is procedurally defaulted. Petitioner has not alleged any cause or prejudice to excuse this procedural default and the Court can find none; as such, this claim will be dismissed as procedurally barred.

### B. Ineffective Assistance of Counsel

The final claim in Petitioner's § 2254 petition alleges that he received ineffective assistance from his trial counsel with respect to counsel's deficient investigation of the *Miranda* waiver forms [Doc. 1].

---

[2] Respondent also argues that Petitioner's claim does not comply with Rule 2(c)(2) of the Rules Governing § 2254 Cases in United States District Courts because Petitioner has failed to state any factual basis for his claim. Because the Court finds that this claim is procedurally defaulted, it need not address this argument.

### 1.    Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A criminal defendant's Sixth Amendment right to counsel necessarily implies the right to "reasonably effective assistance of counsel." *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the *Strickland* standard for proving ineffective assistance of counsel, a defendant must meet a two-pronged test: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Id*.

To prove deficient performance, a petitioner must make a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment." *Id*. The appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged to not have been the result of reasonable professional judgment." *Id*. at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). It is strongly presumed that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

The second prong, prejudice, "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Id*. Here, petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Moss v. United States*, 323 F.3d 445, 454
13

(6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted). Counsel is constitutionally ineffective only if a performance below professional standards caused the defendant to lose what he "otherwise would have probably won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

### 2. Discussion

Petitioner argued to the TCCA on post-conviction appeal that his trial counsel failed to properly investigate the circumstances surrounding the August 14, 2002, *Miranda* waiver, and also failed to consult a handwriting expert to testify at the suppression hearing [Addendum No. 4, Doc. 3, p. 1094]. The TCCA, applying *Strickland v. Washington*, concluded that Petitioner failed to establish deficient performance or prejudice [*Id*. at 1095–96]. Thus, the task before the Court is to determine whether the state court's application of *Strickland* to the facts of Petitioner's case was reasonable.

*Strickland* imposes on counsel the "duty to make reasonable investigations or to make a reasonable investigation that makes particular investigations unnecessary." 466 U.S. at 690. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. at 691. While courts have readily found deficient performance where counsel has failed to conduct a reasonable investigation, *see, e.g., Towns v. Smith*, 395 F.3d 251, 258–59 (6th Cir. 2005) (enumerating cases of ineffective assistance due to failure to investigate), Petitioner has not adequately proven that his trial counsel failed to investigate his *Miranda* waiver forms. Rather, as the TCCA found, the record indicates that trial counsel discussed the issue of the date discrepancy with Petitioner, and raised it in his motion to suppress Petitioner's statement [Addendum No. 4, Doc. 3, p. 1095]. Trial counsel also raised the issue during the

14

motion to suppress hearing and cross-examined the state's witnesses extensively on the issue [Addendum No. 1, Vol. 7, pp. 542–47, 55, 60–63].

Here, Petitioner cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, nor can he overcome the strong deference given to counsel's judgments. Petitioner adds to his argument by stating that counsel should have hired a handwriting expert and presented testimony from the expert at trial [Doc. 1 p. 10]. The TCCA held that Petitioner may only establish prejudice from the failure to call a handwriting expert by presenting testimony from a handwriting expert at his post-conviction hearing [Addendum No. 4, Doc. 3, p. 1096].[3] The Court cannot find that the state court's decision was unreasonable. Accordingly, Petitioner is not entitled to relief on this claim because the state court's decision does not contravene clearly established law, nor was it an unreasonable determination of the facts in light of the evidence presented to it.

## V.    CONCLUSION

For the above mentioned reasons, the Court finds that none of Petitioner's claims warrants issuance of a writ; therefore, Petitioner's 28 U.S.C. § 2254 petition [Doc. 1] will be **DENIED**.

## VI.    CERTIFICATE OF APPEALABILITY

The Court must consider also whether to issue a Certificate of Appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. §

---

[3] Although Petitioner alleges that the state court refused to provide funding for a handwriting expert, Petitioner has not alleged this as a separate claim and the Court will not address it as one.

2253(c)(2).  Where a claim has been dismissed on the merits, a substantial showing is made if reasonable jurists could conclude the issues raised are adequate to deserve further review.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a claim has been dismissed on procedural grounds, a substantial showing is demonstrated when it is shown that reasonable jurists would debate whether a valid claim has been stated and whether the court's procedural ruling is correct.  *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds that reasonable jurists could not conclude that Petitioner's claim of ineffective assistance of trial counsel is adequate to deserve further review, nor would reasonable jurists debate the correctness of the Court's procedural ruling.  As such, because Petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA will not issue.

**AN APPROPRIATE ORDER WILL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**